Filed 9/29/15  Lopez v. City of Scotts Valley and Scotts Valley Police Dept. CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| MARK LOPEZ,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SCOTTS VALLEY; and SCOTTS VALLEY POLICE DEPARTMENT,<br><br>    Defendants and Respondents. | H040490<br>(Santa Cruz County<br>Super. Ct. No. CV176601) |

Mark Lopez, formerly a sergeant for the Scotts Valley Police Department (Department), had his employment terminated after the Department and the district attorney's office investigated him for embezzlement.  Lopez brought a petition for peremptory writ of mandate under Code of Civil Procedure sections 1085 and 1086, seeking to compel the City of Scotts Valley (City) to comply with the provisions of the Public Safety Officers Procedural Bill of Rights Act (Gov. Code, § 3300 et seq. (hereafter referred to as POBRA, or "the Act"))[1] and to prohibit the City from taking punitive action against him.  He argued his rights under POBRA were violated when he was interrogated without proper advisements by investigators working for the district attorney's office. The trial court denied Lopez's petition and he appealed.

---

[1] Unspecified statutory references are to the Government Code.

We conclude substantial evidence supports the trial court's factual determination that the district attorney conducted an independent investigation into Lopez's alleged criminal activities. Therefore, by law, POBRA did not apply. We affirm the court's order denying Lopez's petition.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Investigation and Lopez's Termination*

In 2002, Lopez became the chairman and president of the Scotts Valley Police Officers Association Charitable Foundation (SVPOA). A fellow officer, Dave Ball, was also on the board of the SVPOA. The SVPOA ran an annual fundraiser called "Cops and Rodders," which raised funds to be distributed to local organizations and schools upon request. The funds were also used to award scholarships to college students.

In June 2012, Ball told the Department's chief, John Weiss, that he suspected Lopez was embezzling funds from the SVPOA. Lopez had written a check for $146.51 to the Scotts Valley Water District to pay for his personal water bill. He had also written several $500 checks for a scholarship for his daughter.

According to an internal affairs investigation report dated December 20, 2012, Chief Weiss "elected to have the District Attorney's Office investigate the matter due to the potential criminal charges, as well as to have a neutral third party conduct the investigation." District Attorney Inspector George Rivera, working with fellow inspector Michael Roe, submitted a declaration documenting the investigation, which took place between June and December 2012. Rivera was told that the SVPOA had lost its nonprofit exempt status with the Internal Revenue Service because certain paperwork had been filed late. Rivera was also told that a check had been issued to pay for Lopez's water bill.

Early in the investigation, Rivera and Roe met with Chief Weiss and Lieutenant Wilson to update the Department about their progress. Rivera asserted that "[a]t no time

2

during that meeting did Chief Weiss or Lieutenant Wilson attempt to control or direct [the] investigation." Rivera told the officers that the district attorney's office would act as independent fact finders and would not take direction from the Department. Rivera told the officers he would request their assistance when it was time to interview Lopez.

On September 25, 2012, Rivera and Roe again met with Chief Weiss and Lieutenant Wilson to provide another update to the Department. The investigators informed Chief Weiss and Lieutenant Wilson that they had discovered unusual bank activity with the SVPOA's account and had found several checks written out for a scholarship for Lopez's daughter. Rivera and Roe said they were ready to interview Lopez and were obtaining a search warrant for his home. They requested to interview Lopez at work out of safety concerns. On October 3, 2012, Rivera and Roe provided Wilson with a copy of the district attorney's investigation documents.

On October 5, 2012, the interview with Lopez proceeded as scheduled. Before speaking with Lopez, Rivera met with Lieutenant Wilson and requested that Lopez be disarmed due to the nature of their investigation. Wilson agreed and called Lopez in for the interview. Lopez complied with Wilson's request. He did not have any prior notice that he was going to be interviewed that day. After Lopez came into the office, Wilson told him that investigators from the district attorney's office wanted to talk to him. Wilson did not explain to Lopez that he was being investigated for embezzlement, and Lopez was not told why he was being questioned.

Lopez described in a declaration how the interview took place. He stated that Lieutenant Wilson told him to disarm himself and instructed him to sit down. Once Lopez was seated, Wilson informed Rivera and Roe that he would be "right outside" if they needed anything and closed the door behind him. Lopez asserted that he felt he had no choice but to answer the questions posed by the two investigators because Wilson, his commanding officer, had taken his weapon and had directed him to sit. He also thought

3

Wilson was outside the door. At no point during the interview was Lopez advised of his rights under POBRA. However, Wilson did not threaten Lopez with discipline or termination if he refused to answer questions.

At the end of his interview, Lopez was told that the district attorney's office had obtained a search warrant for his house. Rivera then escorted Lopez to his office so that Lopez could find financial records pertaining to the Cops and Rodders event. Based on Rivera's behavior, Lopez did not think he was free to leave.

Lopez was then escorted to Lieutenant Wilson's office. Wilson gave Lopez a Department memorandum dated October 5, 2012, that explained that internal affairs was conducting a separate inquiry into the matter. The memorandum set forth Lopez's rights under POBRA and advised Lopez that Wilson would interrogate him on October 10, 2012.[2] Wilson placed Lopez on administrative leave, pending the results of the investigation.

Afterwards, Lopez was taken back to his house, where Rivera and Roe conducted a search. Lieutenant Wilson accompanied them. Lopez cooperated and looked for documents related to the Cops and Rodders event. In the process, Lopez discovered cash meant to be deposited for the SVPOA in his truck. Lopez turned the money over to Rivera.

On October 9, 2012, the district attorney's office interviewed Lopez again. The following day, the district attorney's office turned over the evidence it had obtained to the Department, and Lopez was interrogated by Lieutenant Wilson as previously scheduled. David Cariaga, Lopez's union representative, was present during the interrogation.

---

[2] The memorandum advised Lopez that the interrogation would be recorded, and he would have access to the tape. Lopez was also advised he could bring his own recording device and record any and all aspects of the interrogation and had the right to be represented by a representative of his choice who can be present at all times during the interrogation.

4

Lopez invoked his right to remain silent and requested legal counsel. Wilson read Lopez his *Lybarger*[3] rights, informing him that although he had the right to remain silent, his silence could be considered insubordination and could lead to disciplinary action such as termination. Lopez then proceeded to answer questions.

Lieutenant Wilson asked Lopez about the finances for the Cops and Rodders event and about the checks he had written to his daughter from the SVPOA account. At some point, Cariaga asked Lopez if he wanted to talk about "yesterday." Wilson interjected, asking Cariaga if he was referring to the money found in Lopez's truck. Lopez had not previously told Wilson about the money, although the two investigators from the district attorney's office were aware of the discovery.

On December 4, 2012, the district attorney's office filed a report on its investigation into Lopez's actions. Shortly thereafter, the district attorney's office concluded the investigation and declined to prosecute Lopez, citing "insufficient evidence to prove embezzlement." On December 20, 2012, the Department concluded its internal affairs investigation.

The Department issued a notice of proposed termination to Lopez on January 8, 2013, and Lopez was terminated on January 23, 2013.[4] In a submitted declaration, Chief Weiss asserted that the Department did not rely on any statements Lopez made during the interview conducted by the district attorney's office on October 5, 2012, when deciding to terminate Lopez.

*Procedural History*

On July 22, 2013, Lopez filed a first amended verified petition for writ of mandate to compel the City to comply with POBRA and to prohibit any punitive action against

---

[3] *Lybarger v. City of Los Angeles* (1985) 40 Cal.3d 822.

[4] Lopez has appealed the City's decision to terminate, and a hearing before the city council is presently pending.

Lopez. The petition alleged that Lopez had been denied his rights and protections under POBRA because the Department and the district attorney's office acted in concert to investigate his alleged embezzlement, and the district attorney's office failed to inform Lopez of his POBRA rights during an October 2012 interview.

On November 25, 2013, the trial court denied Lopez's petition. In its statement of decision, the court reasoned that it found the investigation by the district attorney's office to be an independent criminal investigation that did not trigger Lopez's POBRA rights. The court further concluded that the Department's involvement did not convert the district attorney's investigation into "some type of joint action by both the Scotts Valley Police Department and the District Attorney's office." The trial court entered judgment in favor of the City and the Department.

## DISCUSSION

Lopez argues the trial court erroneously denied his petition because the interview by the district attorney's office that took place on October 5, 2012 violated his rights under POBRA.

### 1. *Standard of Review*

The City and the Department contend that the trial court's denial of Lopez's writ petition hinged on its factual finding that the district attorney was conducting an independent criminal investigation into Lopez's alleged embezzlement. Therefore, they argue that a substantial evidence standard of review should apply. (See *Steinert v. City of Covina* (2006) 146 Cal.App.4th 458, 462 [applying substantial evidence standard of review the trial court's conclusion that conversation between police officer and his superior was a routine communication and was therefore not subject to POBRA].)

Acknowledging that we review a trial court's factual findings for substantial evidence, Lopez contends that we must review pure questions of law pertaining to the application of POBRA de novo. (*Alhambra Police Officers Assn. v. City of Alhambra*

6

*Police Dept.* (2003) 113 Cal.App.4th 1413, 1420 ["[w]e consider de novo whether [POBRA] applies"] (*Alhambra Police Officers Assn.*).)

Both parties are correct. To the extent our analysis turns on a pure question of law related to the trial court's application of POBRA, we must review the decision de novo. (*Alhambra Police Officers Assn.*, *supra*, 113 Cal.App.4th at p. 1420.) However, as articulated by the City, our review of "any factual findings by the court 'is based on the substantial evidence standard of review applied to trial court decisions.' " (*Ibid.*) We therefore evaluate the trial court's factual determinations, such as its conclusion that the district attorney's investigation was independent, for substantial evidence.

2. *Lopez's Arguments*

a. **Overview of POBRA and Lopez's claims**

"The purpose of [POBRA] is 'to maintain stable employer-employee relations and thereby assure effective law enforcement.' " (*Pasadena Police Officers Assn. v. City of Pasadena* (1990) 51 Cal.3d 564, 572.) POBRA affords peace officers certain rights to ensure fair treatment during an internal affairs interrogation. (*Id.* at p. 574.)

Specifically, "POBRA provides that '[w]hen any public safety officer is under investigation and subjected to interrogation by his or her commanding officer, or any other member of the employing public safety department, that could lead to punitive action, the interrogation' must include certain safeguards. (§ 3303.) These include, among other things, the officer's right to be informed of the nature of the investigation prior to any interrogation, the right to be represented by a representative of his or her choice (*id.*, at subds. (c) and (i)), access to the tape if the interrogation is recorded, the right to bring a recording device and the right to be warned that not answering questions may result in punitive action (*id.*, at subds. (c) and (g))." (*Van Winkle v. County of Ventura* (2007) 158 Cal.App.4th 492, 497 (*Van Winkle*).)

However, POBRA is not applicable to all interrogations. It does not apply to "any interrogation of a public safety officer in the normal course of duty, counseling, instruction, or informal verbal admonishment by, or other routine or unplanned contact with, a supervisor or any other public safety officer," nor does it apply to "an investigation concerned solely and directly with alleged criminal activities." (§ 3303, subd. (i).)

b. **Independent investigation by the district attorney's office**

Lopez's claims all relate to his initial October 5, 2012 interrogation by district attorney investigators. The district attorney's office has no authority to discipline or terminate Lopez, and is an outside agency not typically subject to POBRA. Lopez nonetheless insists that POBRA applies based on case law concluding that investigations conducted by independent agencies with significant involvement or assistance with the law enforcement employer are subject to POBRA. He asserts that the district attorney's office colluded with the Department, rendering its investigation subject to POBRA. He claims POBRA was violated when the two investigators from the district attorney's office failed to advise him of his rights under POBRA during the October 5 interview.

Lopez relies primarily on *California Correctional Peace Officers Assn. v. State of California* (2000) 82 Cal.App.4th 294 (*CCPOA*). In *CCPOA*, the appellate court concluded that POBRA applied to an investigation conducted by the California Department of Justice (DOJ) into alleged misconduct by correctional officers employed by the California Department of Corrections (CDC). The DOJ had coordinated its investigation with the CDC. The warden, in a meeting with CDC staff, informed them they would be interviewed by the DOJ, would not be allowed legal representation, and would not be allowed to consult with counsel beforehand. (*Id*. at p. 300.) Staff members

8

were told that pursuant to section 3304, subdivision (a),[5] they would be required to cooperate in the DOJ's investigation. (*CCPOA*, *supra*, at p. 300.) Interviews were conducted at the prison, where staff members were isolated by CDC special service agents until it was their turn to answer questions. Additionally, staff members were threatened with disciplinary action and were told that if they taped their interviews, the tapes could be seized as criminal evidence. (*Id*. at pp. 300-301.)

The *CCPOA* court determined that POBRA applied, remarking: "[I]n this situation, the DOJ's involvement does not serve to immunize the CDC from the provisions of section 3303. The CDC and DOJ must be considered to have been acting together in this investigation. The CDC did not merely order the correctional officers to cooperate with the DOJ investigation, but delivered interviewees to DOJ investigators, and threatened them with arrest and/or discipline if they asserted their rights during interrogation by DOJ agents. Until they had given statements, correctional officers were prevented from leaving prison grounds by their employer. Hallway exits and interrogation rooms were guarded by the CDC. The interviews took place during work hours or immediately thereafter, on work premises. Upon being told by DOJ interrogators that an officer was not providing satisfactory responses during the interrogation, the CDC employees threatened the officers with criminal and disciplinary sanctions. Under these circumstances, the CDC and the DOJ must be considered to have been acting in concert." (*CCPOA*, *supra*, 82 Cal.App.4th at p. 307.) Accordingly, the *CCPOA* court concluded that the DOJ was required to comply with POBRA.[6]

---

[5] Section 3304, subdivision (a) states in pertinent part: "Nothing in this section shall preclude a head of an agency from ordering a public safety officer to cooperate with other agencies involved in criminal investigations. If an officer fails to comply with such an order, the agency may officially charge him or her with insubordination."

[6] The *CCPOA* court further noted that subdivision (i) of section 3303 contained an exception for " 'an investigation concerned solely and directly with alleged criminal (continued)

Other courts have followed the reasoning set forth in *CCPOA*. In *Berkeley Police Assn. v. City of Berkeley* (2008) 167 Cal.App.4th 385 (*Berkeley Police Assn.*), the appellate court concluded that the City of Berkeley's Police Review Commission (PRC), an independent agency investigating citizen complaints against Berkeley police officers, was required to comply with POBRA. (*Id.* at pp. 407-410.) The PRC itself had no authority to order police officers to provide statements for a PRC investigation. Instead, the PRC had to notify the chief of police that it sought to interview an officer. Afterwards, the chief of police would issue a written order to the officer stating that the officer would be subject to departmental charges that could result in dismissal or discipline if the officer refused to answer questions. (*Id.* at p. 408.) Based on these circumstances, the appellate court concluded that like in *CCPOA*, the department essentially forced officers to comply with the PRC's interrogation by threat of discipline or dismissal. (*Ibid.*) Therefore, the PRC was required to comply with POBRA.

---

activities,' " and subdivision (a) of section 3304 contained a corollary provision authorizing employers to require employees to cooperate with other agencies involved in a criminal investigation. (*CCPOA*, *supra*, 82 Cal.App.4th at p. 307.) However, it concluded that "the criminal investigations referred to in subdivision (i) of section 3303 and subdivision (a) of section 3304 must be ones conducted primarily by outside agencies without significant active involvement or assistance by the employer." (*Id.* at pp. 308-309.) As Lopez acknowledges, there is a split of authority on this issue. Notably, the appellate court in *Van Winkle*, *supra*, 158 Cal.App.4th 492 declined to follow *CCPOA*'s interpretation of section 3303, subdivision (i). Instead, *Van Winkle* concluded that the exception for solely criminal investigations should apply in equal force to law enforcement employers, not just to outside agencies conducting independent investigations. (*Van Winkle*, *supra*, at p. 500.)

We need not address this split of authority. Here, the investigation at issue was one conducted by the district attorney's office, an outside agency that does not employ Lopez or have a say in the decision to terminate Lopez's employment. Both *CCPOA* and *Van Winkle* are in agreement that an *outside agency's independent investigation* is not covered by POBRA.

10

Here, the trial court determined that the investigation conducted by the district attorney's office was independent and not subject to POBRA. It stated so in its statement of decision, where it concluded that the cooperation between the Department and the district attorney's office did not convert the district attorney's investigation into a joint action. The trial court's finding that the investigation was independent is a factual determination, which we must uphold if supported by substantial evidence. (*Steinert v. City of Covina*, *supra*, 146 Cal.App.4th at p. 465.)

We conclude that there is substantial evidence in the record to support the court's determination. The district attorney's investigators submitted sworn declarations that their investigation was independent of the Department. The investigators declared that they coordinated with the police department to facilitate Lopez's interview out of safety concerns. Unlike *CCPOA* or *Berkeley Police Assn.*, there was no overwhelming evidence of coordination between the district attorney's office and the Department. Lopez's commanding officer, Lieutenant Wilson, did not threaten Lopez with discipline if he failed to comply with the interview. Nor did Wilson inform Lopez that he was not free to leave the premises until after he finished the interview with the district attorney's investigators. Wilson ordered Lopez to come into the police station to be questioned, but he did so after the district attorney's office independently requested assistance from the Department to coordinate the interview out of safety concerns. The district attorney investigators met with the Department multiple times, but the investigators declared that they did not take directions from the Department during the course of their investigation.

We note there is evidence that would tend to support Lopez's theory of a joint investigation by the Department and the district attorney. For example, the interview by the investigators took place during work hours at the police station. Lopez was escorted to the interview room by Lieutenant Wilson, who disarmed him before moving him into

11

the interview room. Wilson also told the two district attorney investigators that he would be outside the interview room if they needed assistance.

However, "[w]hen a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination, and when two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court. *If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion*." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874.)

Substantial evidence supports the trial court's factual finding that the district attorney's office conducted an independent investigation, so this finding must stand. Lopez argues there is a difference between whether two agencies are "acting together" in an investigation or whether an agency is acting "independently or legitimately." He further claims that in order for POBRA to apply, no subterfuge is required. Under Lopez's interpretation, if the outside agency is acting *together* with an agency subject to POBRA, the outside agency would be subject to POBRA. We agree that under the *CCPOA*, if the agencies are determined to be acting in concert, POBRA may apply. (*CCPOA*, *supra*, 82 Cal.App.4th at p. 307.) But here, the trial court determined that the investigation by the district attorney's office was *independent* in that the collaboration it had with the Department did not transform its investigation into a joint effort. Therefore, by finding the investigation to be independent, the trial court also found that the two agencies did *not* act in concert.

We must now determine, under a de novo standard of review, if the court correctly concluded the provisions of POBRA were inapplicable to the district attorney's

12

independent investigation.  We conclude, with the trial court's finding that the investigation was independent and not a joint effort, it necessarily follows that the procedural safeguards afforded to Lopez under POBRA did not apply to the initial interview conducted by the district attorney's office on October 5, 2012.  POBRA does not apply to independent investigations conducted by outside agencies.  (*Alhambra Police Officers Assn.*, *supra*, 113 Cal.App.4th at pp. 1421-1422.)  Accordingly, the trial court did not err when it denied Lopez's petition.

c. **The exception for investigations solely concerning criminal activity**

Lopez next argues that the exception set forth under section 3303, subdivision (i), exempting from POBRA those investigations that solely concern criminal activities, is inapplicable.  Although Lopez was investigated for embezzlement, a criminal act, he claims that the district attorney's investigation went beyond the alleged embezzlement.  He cites to the district attorney investigators' examination of his record with the Department as proof that the investigation extended beyond his alleged criminal activity.

We need not address this argument, because we already concluded that the trial court did not err when it found POBRA was inapplicable to the district attorney's investigation since it was independent from the Department's investigation.  Further, by not raising this issue in the trial court, Lopez has forfeited it on appeal.  In his petition for writ of administrative mandamus, Lopez's lone argument was that the interrogation by the district attorney's office on October 5, 2012 was subject to POBRA because the Department joined forces with the district attorney in conducting its investigation.  Therefore, when it considered the merits of Lopez's claims, the trial court did not make a factual determination on whether the investigation *solely concerned* alleged criminal activities.  The trial court only made a finding that the district attorney's investigation

13

was *independent* at all times.[7]  Because he failed to raise this issue below, he has waived his argument on this point.  (*California State Auto Assn. Inter-Ins. Bureau v. Antonelli* (1979) 94 Cal.App.3d 113, 122.)

### d.  **Other claims**

Based on our conclusion that the trial court did not err in denying Lopez's petition for writ of mandamus, we need not decide Lopez's other claims regarding the appropriate remedy required in his case and whether civil penalties should be imposed on the City and the Department.

### DISPOSITION

The order is affirmed.  The City of Scotts Valley and the Scotts Valley Police Department are entitled to their costs on appeal.

---

[7] The statement of decision reads in pertinent part:  "Petitioner agreed that the only finding of fact the Court needs to make to decide [the] issue is whether or not the District Attorney's office investigation was an independent, legitimate investigation."  Nowhere in Lopez's petition did he argue that the district attorney's investigation was administrative in nature, or concerned noncriminal activity.

                                                                     Grover, J.

WE CONCUR:

                          Rushing, P. J.

                          Elia, J.